# FREEMAN, NOOTER & GINSBERG
## ATTORNEYS AT LAW

LOUIS M. FREEMAN
THOMAS H. NOOTER*
LEE A. GINSBERG

30 VESEY STREET
SUITE 100
NEW YORK, N.Y. 10007

*NY AND CALIF. BARS

(212) 608-0808
(212) 962-9696 (FAX)

March 1, 2012

Via ECF

Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: <u>United States v. Tyrone Wilson, 10 Cr. 615 (NGG)</u>

Dear Judge Garaufis:

Introduction

Our office represents Tyrone Wilson with respect to the above captioned matter. This letter and its attachments are submitted to aid the court in sentencing Mr. Wilson. For the reasons that follow, we respectfully request that the court impose a sentence of 60 months, the applicable mandatory minimum sentence. We do not agree with the Probation Department's assessment that he is subject to the provisions of 4B1.1 as a career offender, primarily because we believe that his prior criminal conduct is relevant conduct, as it all occurred during the course of the conspiracy. The government stands by the plea agreement range of 57 to 71 months.

The Plea Agreement and the PSR's Advisory Guidelines

Mr. Wilson pled guilty pursuant to a plea agreement which contained the following analysis: the base offense level is 26 because Mr. Wilson's participation in the conspiracy

involved at least 50 grams of crack and a 3 level reduction applies for his timely acceptance of responsibility. With a criminal history category of III, the advisory range is 57 to 71 months. However, because there is a statutory minimum of 60 months, the effective guideline range is 60 to 71 months.

On the other hand, Probation has determined that the base offense level is 34 and the criminal history category is VI and claim that Mr. Wilson is a career offender pursuant to 4B1.1(b) and 1B1.3, application note 8. After deducting 3 levels for his timely acceptance of responsibility, the resulting guideline level is 31 and the advisory sentence range is 188 to 235 months.

We disagree with this analysis and request that the court adopt the analysis contained in the plea agreement which determined his guideline level based on the weight of narcotics involved in the conspiracy and the fact that Mr. Wilson is in criminal history category III. In the alternative, should the court determine that Mr. Wilson is subject to the career offender provisions, we request that the Court exercise its discretion and impose a "non-guideline" sentence within the advisory range that was stipulated to in the plea agreement.

<u>Mr. Wilson's Criminal History Computation and Relevant Conduct</u>

As set forth in the plea agreement, Mr. Wilson is in a criminal history category III as a result of his having four criminal history points. A review of his record reveals that he has four prior arrests and corresponding convictions pertaining to narcotics possession and/or sale of narcotics (PSR ¶35, 37, 41, and 43). However, of these arrests, all but one[1] should be considered

---

[1] See PSR ¶41. This arrest involved both marijuana and crack, whereas the instant offense of conviction does not involve marijuana.

relevant conduct to the instant offense, pursuant to §1B1.3(a)(1)(A) and Application Note 8, and should not be counted as "prior sentences" in Mr. Wilson's criminal history computation under §4A1.1(b) and §4A1.2 (a)(1) ("any sentence previously imposed….for conduct that is not part of the instant offense"), nor as a "prior felony convictions" under §4B1.1(a) and 4B1.2(c)(2)("the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of §4A1.1(a), (b) or (c)").   Two points result from his conviction for criminal possession of a controlled substance, (involving both crack and marijuana) for which he was sentenced to six months custody and five years probation and two points result from his committing the instant offense while subject to a sentence of probation resulting from this arrest.

  Nevertheless, the convictions referenced in ¶35, 37 and 43 are all part of the instant offense and should not count separately towards his criminal history computation, nor should they count towards a determination that he is a career offender.  Significantly, these three arrests all occurred during the duration of the conspiracy, which ran from 2006 until 2010 as set forth in the indictment and the plea agreement.  See Indictment S2 10-615 (NGG), Count One ("between January 2006 and July 2010"); see also Plea Agreement ¶1 ("plead guilty to Count One") and ¶5a ("no further charges will be brought against the defendant for his distribution of crack cocaine in and around the Gowanus Public Housing Development in or about and between 2006 and 2010"), and see PSR ¶11 ("Wilson is responsible for distributing 50 grams of crack cocaine during the course of the conspiracy").  In addition, these three arrests all occurred within the geographical area of the conspiracy (in and around the "Gowanus Public Housing Development" area), and they all involved the same substance as the conspiracy, namely crack.  Even though they are technically separated by intervening arrests, they are all part of the same course of

conduct for which Mr. Wilson was charged and to which he pled guilty, namely conspiracy to possess and distribute crack from 2006 until 2010. See §1B1.3(a)(1)(A) and Application Note 8("…in certain cases, offense conduct associated with a previously imposed sentence may be expressly charged in the offense of conviction"). The analysis contained in the plea agreement reflects this view.

Should the court agree with the probation department, we would nonetheless request a sentence within the guideline estimate contained in the plea agreement. While the plea agreement does note that the analysis contained therein is not binding on Probation or the Court, the estimate is significant as it is what induced Mr. Wilson to enter a plea of guilty and resolve his case without going to trial.

<u>Personal History and Characteristics</u>

Mr. Wilson is a 28 year old man who grew up in a fractured family in the public housing projects of Brooklyn. His parents were not married and did not live together. He was raised by his mother and grandmother. He has maintained a close and loving relationship with his mother and grandmother but he is particularly close to his grandmother who is 88 years old as he was her caretaker and companion for many years until his arrest. In her letter to the Court, Ms. Shepherd describes him as her "favorite grandchild", who has helped her in many ways through out the years. See attached letter from Jhonnie Mae Shepherd. Even though Tyrone has been in jail since August 2010, they remain supportive of Tyrone and have attended most of his court appearances, which for his grandmother is particularly difficult as she is physically infirm and requires the assistance of a walker to get around. Ms. Shepherd speaks to him regularly on the phone and visits him at the prison as often as she can.

While his father did not live with Tyrone growing up, Tyrone did see him often and had a good relationship with him up until his father passed when Tyrone was just a young teen. What Tyrone did not know until some years later was that his father was a heroin addict who had contracted the AIDS virus through his drug abuse. When Tyrone's father succumbed to this illness it left Tyrone devastated. His father's passing removed the only male role model and male influence in Tyrone's young life. His devastation was compounded with disappointment and heartbreak when he found out about his father's addiction and illness.

After his father's death, the only other males around for Tyrone to look up to were the ones who hung outside his house that he saw every day. These were the drug dealers living in his housing project. From the perspective of someone living in public housing without a male role model, it is difficult to resist the lure of drug dealing when a young person sees, every day, that these are the people who have nice clothes and beautiful cars and a seemingly "easy life". They stand in stark contrast to the hard working individuals who look like they struggle everyday just to make ends meet, as his own mother did.

Once he became involved with the streets, it was very difficult for him to stop. Even after he was convicted and sentenced in March of 2007 for his other cases, he remained on the streets to earn money. While he was no longer living at the Gowanus Houses himself because he had moved to his Aunt's house after completing a drug program, he continued to sell drugs at the Gowanus Houses alongside his friends, and he continued smoke pot and drink with them as well.

In the time since his arrest and incarceration in August 2010 he has had time to reflect on the type of life he was living and he has come to realize that he was living a futile and tiring existence and he is grateful to be away from it. He also realizes that the men he was trying to

emulate were not suitable replacements for the father figure he was trying to replace.

### Drug Use

Tyrone has never been addicted to the stronger narcotics such as crack, cocaine or heroin; nevertheless, Tyrone has a history of drug and alcohol abuse and needs treatment. While Tyrone indicated in his presentence interview that he does not believe that he 'needs' drug treatment, he absolutely does and we request that Your Honor recommend placement in the Bureau of Prison's residential drug treatment program. His denial of having a problem is exactly that – denial. Tyrone has smoked marijuana on a daily basis for many years and did not ever stop using marijuana on his own accord – he only stopped when required as part of his sentence in the previous cases. Even though he completed an outpatient drug program at one point in his history, he reverted to use and that is a prime indicator that he is the type of person who would most benefit from the Residential Treatment Program.

### Network of Support

In addition to his mother and grandmother, Tyrone has the support of many other people in his life, including his sisters, his Aunt and his girlfriend Sasha. See Attached Letters. All of his friends and relatives are aware of Tyrone's arrest and incarceration and they know the reasons behind it. While they are devastated that he is in jail, they are grateful that he did not meet a worse end as so many other young people in their neighborhood have and they look forward to helping him rebuild his life when he is released.

Having a network of support is very important to rehabilitation as it will give Tyrone motivation to remain compliant with conditions of supervision and to remain lawful in the future. Tyrone knows that he has disappointed those who love him and know that he knows they have

stood by him because they have faith in him, he does not want to disappoint them again in the future.

Conclusion

For the foregoing reasons, we respectfully request a sentence of 60 months; a recommendation that he be placed in the BOP's residential drug treatment program; and a recommendation for placement as near to New York City as possible to facilitate family visitation.

                                          Respectfully submitted by:

                                          *Louis Freeman/Janet Mace*

                                          Louis Freeman
                                          Janet C. Mace

cc:      AUSA Carter Burwell (via ECF)